1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

MICHAEL W. PALLAS, SR.,

11                          Plaintiff,

12          v.

13  JO ANNE B. BARNHART, Commissioner of
    Social Security,

14

15                          Defendant.

16

17

CASE NO. C04-5799KLS

ORDER AFFIRMING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

18

19          Plaintiff, Michael W. Pallas, Sr., has brought this matter for judicial review of the denial of his

20  application for disability insurance benefits.  The parties have consented to have this matter be heard by the

21  undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and

22  Local Magistrates Rule 13.  After reviewing the parties' briefs and the remaining record, the undersigned

23  hereby finds and ORDERS as follows:

24                          FACTUAL AND PROCEDURAL HISTORY

25          Plaintiff currently is fifty-two years old.[1] Tr. 40.  He graduated from high school and has past work

26  experience as a sales route and heavy equipment truck driver and a food products sales representative. Tr.

27

28

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

147, 588.

Plaintiff filed an application for disability insurance benefits on September 16, 1997, alleging disability as of October 28, 1990, due to a broken bone in his back, arthritis in his lower back, and herniated discs.[2] Tr. 40, 51.  That application was denied initially and on reconsideration. Tr. 43-44, 49, 50A. Plaintiff did not seek further review of that denial. Tr. 19.

Plaintiff filed another application for disability insurance benefits on December 1, 1998, alleging disability as of October 28, 1990, due to a back injury. Tr. 130, 141.  His application was denied initially and on reconsideration. Tr. 92-94, 100.  Plaintiff requested a hearing, which was held on October 27, 2000, before an administrative law judge ("ALJ"). Tr. 502.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did plaintiff's wife and a vocational expert. Tr. 502-44.

On December 20, 2000, the ALJ issued a decision, finding plaintiff capable of performing other jobs existing in significant numbers in the national economy, and therefore not disabled. Tr. 384-93.  On March 28, 2003, however, the Appeals Council remanded the matter back for further consideration of the evidence in the record. Tr. 398-401.  A new hearing was held before a different ALJ on July 17, 2003. Tr. 545.  At the hearing, plaintiff, represented by counsel, again appeared and testified, as did plaintiff's wife, two medical experts, and a vocational expert. Tr. 545-92.

On November 17, 2003, the second ALJ issued a decision determining plaintiff to be not disabled, finding specifically in relevant part as follows:

(1)   at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity prior to June 28, 1998, his date last insured, but did engage in such activity during 1999 and 2000;

(2)   at step two, plaintiff had the "severe" impairment of degenerative lumbar disc disease;

(3)   at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)   at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and

(5)   at step five, plaintiff was capable of performing other work existing in significant numbers in the national economy.

_____

[2]Apparently, plaintiff also filed two previous applications, beginning in late October 1991. Tr. 19.  However, neither of those applications are contained in the record.

REPORT AND RECOMMENDATION
Page - 2

Tr. 20, 27-28.  Plaintiff's request for review was denied by the Appeals Council on October 1, 2004,

making the ALJ's decision the Commissioner's final decision. Tr. 9; 20 C.F.R. § 404.981.

On November 26, 2004, plaintiff filed a complaint in this court seeking review of the second ALJ's

decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits

because:

(a)     the ALJ improperly found plaintiff performed substantial gainful activity in 1999
        and 2000;

(b)     the ALJ erred in finding plaintiff did not have a severe mental impairment;

(c)     the ALJ improperly found plaintiff did not meet or equal the requirements of 20
        C.F.R. Part 404, Subpart P, Appendix 1, § 12.04;

(d)     the ALJ improperly rejected plaintiff's testimony;

(e)     the ALJ improperly rejected the testimony of plaintiff's wife; and

(f)     the ALJ improperly found jobs existed in significant numbers in the national
        economy that plaintiff could perform.

For the reasons set forth below, however, the undersigned finds the ALJ did not err in determining plaintiff

to be not disabled.

<u>DISCUSSION</u>

This court must uphold the Commissioner's determination that plaintiff is not disabled if the

Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson</u>

<u>v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir.

1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

one rational interpretation, the court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d

577, 579 (9th Cir. 1984).

I.      <u>Plaintiff's Date Last Insured</u>

To be entitled to disability insurance benefits, plaintiff "must establish that [his] disability existed on

or before" the date his insured status expired. <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998); <u>see also</u>

Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status).  Plaintiff's date last insured was June 30, 1998. Tr. 19, 92.  Therefore, to be entitled to disability insurance benefits, plaintiff must establish he was disabled prior to or as of that date. Tidwell, 161 F.3d at 601.  As discussed below, however, plaintiff has not done so.

II.      Plaintiff's Work Activity During 1999 and 2000

       A claimant will not be entitled to disability insurance benefits for any period of time during which he or she has engaged in "substantial gainful activity." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999); 20 C.F.R. § 404.1520(a)(4)(i), (b).  If, during the period July 1999 through December 2000, a claimant's earnings averaged greater than $700.00 per month, this will "ordinarily show" the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1574(b)(2).  These threshold earnings levels, however, are only presumptions that a claimant is or is not able to engage in substantial gainful activity.

       A claimant's earnings thus "are not the end of the inquiry." Soria v. Callahan, 16 F. Supp.2d 1145, 1149 (C.D. Cal. 1997).  "'Substantial work activity'" is defined "as work that 'involves doing significant physical or mental activities' and 'is the kind of work usually done for pay or profit.'" Id. (quoting 20 C.F.R. § 416.972(a), (b)).  Thus, work "'may be substantial even if it is done on a part-time basis.'" Id. (quoting Byington v. Chater, 76 F.3d 246, 250 (9th Cir. 1996)). In addition, "'[w]ork activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.'" Id. at 1150 (quoting 20 C.F.R. §§ 404.1572(b), 416.972(b)).

       If a claimant's duties require use of his or her "experience, skills, supervision and responsibilities," or those duties "contribute substantially to the operation of a business," this also tends to show the claimant has "the ability to work at the substantial gainful activity level." 20 C.F.R. §§ 404.1573(a).  If, on the other hand, the claimant performed work under "special conditions," such work may be found not to constitute substantial gainful activity. 20 C.F.R. § 404.1573(c).  Nevertheless, "work done under special conditions may show that" that claimant has "the necessary skills and ability to work at the substantial gainful activity level." Id.  Examples of such special conditions include:

       (1)     [The claimant] required and received special assistance from other employees in
               performing your work;

(2)     [The claimant was] allowed to work irregular hours or take frequent rest periods;

(3)     [The claimant was] provided with special equipment or [was] assigned work especially suited to your impairment;

(4)     [The claimant was] able to work only because of specially arranged circumstances;

(5)     [The claimant was] permitted to work at a lower standard of productivity or efficiency than other employees; or

(6)     [The claimant was] given the opportunity to work despite [the claimant's] impairment because of family relationship, past association with [the claimant's] employer, or [the claimant's] employer's concern for [the claimant's] welfare.

Id.

With respect to plaintiff's work activity during 1999 and 2000, the ALJ found in relevant part as follows:

The claimant's earnings record shows income in 1999 and substantial levels of income in 2000 (exhibit 6D). [T]he claimant testified that he had returned to truck driving in 1999 and had worked for about 18 months. The claimant's earnings record shows that he earned $3,988.27 in 1999 and $16,149.00 in the year 2000. The claimant testified that during this approximately eighteen month period he was driving a truck, hauling logs. He stated that he worked on an as needed basis, but was able to come and go as he wanted and was provided a "nice seat" in the truck. He also said that he normally worked one haul a day and didn't have to perform heavy lifting. . . . In this case the claimant testified that he worked a substantial part of the day, doing work similar to that of other truck drivers – even though he was working in a medium to heavy job in a light capacity. While he was not required to do the heavy lifting often involved with log hauling, he did perform on a regular basis the essential elements of a truck driver's job, namely drive his heavy truck from location to location. Given the nature, regularity and his ability to perform the work satisfactorily with only minimal accommodations over an extended period of time, it is concluded that this was substantial gainful activity.

Tr. 20. Plaintiff argues the above findings were improper, in light of the fact that he performed the above job for only nine months under special conditions. The undersigned disagrees. First, it must be noted that because, as discussed below, plaintiff has failed to show he was disabled prior to his date last insured, the issue of whether he performed substantial gainful activity after that date is essentially moot. Nevertheless, the undersigned shall address plaintiff's specific argument.

It is unclear exactly how long plaintiff worked as a truck driver in 1999 and 2000, although it does appear that it was for less than 18 months total. Tr. 515-16. Plaintiff's earnings records for that time period show, however, that he earned on average $839.00 per month, well over the $700.00 threshold ordinarily indicative of substantial gainful activity. Tr. 424, 427; 20 C.F.R. § 404.1573(b)(2). Further, while it does

1    seem that plaintiff received a number accommodations performing that job, which would appear to qualify

2    as "special conditions" under 20 C.F.R. § 404.1573(c) (Tr. 517, 528-30, 551-53, 566-67), given the ALJ's

3    sole responsibility for resolving conflicts in the evidence, the undersigned cannot fault the ALJ for finding

4    the ability to perform even at the decreased level testified to by plaintiff, to be indicative of an ability to

5    perform at the substantial gainful activity level. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998);

6    Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  Indeed, plaintiff reported in early January and late

7    June 2000, that his work hours were 2:30/3:00 a.m. to 5:30 p.m. Tr. 332, 334.

8    III.    The ALJ Properly Found Plaintiff Did Not Have a Severe Mental Impairment

9         To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

10   sequential evaluation process. 20 C.F.R. § 404.1520.  At step two, the ALJ must determine if an impairment

11   is "severe".  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or

12   physical abilities to do basic work activities. 20 C.F.R. §§ 404.920(a), ( c); Social Security Ruling ("SSR")

13   96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most

14   jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

15        An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

16   than a minimal effect on an individual['] ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

17   Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

18   has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work

19   activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

20   601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used

21   to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

22        With respect to plaintiff's alleged mental impairments, the ALJ found as follows:

23        The credible evidence of record shows that on and before the date he was last insured,
          the claimant had a depressive disorder NOS.  This impairment caused no restrictions in
24        daily living activities or social functioning, and only mild difficulty with concentration,
          persistence, and pace. There is insufficient evidence of any extended episodes of
25        decompensation.  He therefore did not have a severe mental impairment.

26   Tr. 25.  Plaintiff argues that the substantial evidence in the record does not support these findings.  The

27   undersigned disagrees.

28        The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

REPORT AND RECOMMENDATION
Page - 6

medical evidence. Reddick, 157 F.3d at 722. Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample, 694 F.2d 639 at 642. In such cases, therefore, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

REPORT AND RECOMMENDATION
Page - 7

1    The only psychological evaluation of plaintiff in the record dated prior to his date last insured is one

2    conducted by William A. Burkhart, Ph.D., in late February 1997.  Psychological testing performed by Dr.

3    Burkhart suggested "more problems with thinking speed, mental flexibility, or complex attention than 90%

4    of" plaintiff's "healthy age peers." Tr. 212.  He diagnosed plaintiff with psychological factors affecting a

5    physical condition, and it was his impression that plaintiff was "not particularly quick or abstract in his

6    thinking," and that there were "probably cognitive-intellectual barriers that" made "it difficult for him to

7    return to anything but his usual and customary labor-intensive work." Tr. 213.  Nevertheless, Dr. Burkhart

8    assessed plaintiff with a global assessment of functioning ("GAF") score of 75, concluding his evaluation

9    report as follows:

10           I would see no reason to even temporarily authorize psychological counseling or other
             kinds of psychological services as an aid to recovery.  There is no reason he cannot
11           work from a psychological standpoint, even though the issues with his aptitude and
             possible misuse of pain medications to do more than he should from a physical capacities
12           standpoint are worth noting.

13   Tr. 214 (emphasis added).  In light of this last statement, and despite Dr. Burkhart's earlier statements, it

14   was not unreasonable for the ALJ to conclude that plaintiff had no severe mental impairment prior to his

15   date last insured. Reddick, 157 F.3d at 722 (ALJ is responsible for determining credibility and resolving

16   ambiguities and conflicts in medical evidence); Sample, 694 F.2d 639 at 642 (where medical evidence is not

17   conclusive, questions of credibility and resolution of conflicts" are sole functions of ALJ).

18           The medical evidence in the record concerning plaintiff's mental impairments dated subsequent to

19   his date last insured also supports the ALJ's findings.  Plaintiff was evaluated by Dr. Andy J. Sands in mid-

20   August 2000.  With respect to plaintiff's mental status examination, Dr. Sands noted that although he was

21   tense and anxious, he appeared to be "clear in his thinking, without any evidence of thought disorder." Tr.

22   323.  Plaintiff reported that there had been "some periods in the past" when he had "some fleeting thoughts

23   of suicide," but not recently. Id.  Dr. Sands diagnosed him as having a depressive disorder, with a possible

24   adjustment disorder with mixed emotions, a pain disorder secondary to a general medical condition, and a

25   GAF score of 55 to 60. Id.  Dr. Sands concluded as follows:

26           It is felt that he deserves and should have at least some psychiatric treatment for
             supportive psychotherapy.  Medications could be considered, but mainly he needs a
27           place to vent and to clarify his thoughts with someone objective and empathetic to his
             concerns.  Therefore it is recommended to the Department of Labor & Industry that
28           psychiatric treatment be authorized at this time, under his claim.  It is estimated that
             perhaps as much as six-nine-months of treatment may be needed.

Tr. 324.

In early February 2001, Dr. Sangs wrote a letter stating that plaintiff's psychiatric diagnosis had "not changed" since the original evaluation. Tr. 491.  Dr. Sands stated that plaintiff was making "some real headway from a psychiatric standpoint," and that his "irritability and obsessive tendencies" had been "drastically reduced." Id.  A similar letter was written by Dr. Sands in early April 2001, in which he stated that plaintiff's medications seemed "to have been of some help in reducing overall his pessimistic mood and intense anxiety levels." Tr. 490.  Accordingly, Dr. Sands felt that psychologically, plaintiff was "doing better" with his treatment and medications. Id.  In late October 2001, however, Dr. Sands wrote a third letter, in which he stated that plaintiff's "emotional status" was "so fragile," that it would "preclude" his "being able to sustain employment." Tr. 488.

As discussed above, in early August 2000, more than two years after plaintiff's insured status had expired, Dr. Sands felt plaintiff would require psychiatric treatment for at most nine months. See Tackett, 180 F.3d at 1098 (claimant has burden of proving he or she suffers from medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months).  Plaintiff also continued to show improvement from a psychiatric standpoint through at least late October 2001.  More significantly, Dr. Sands' made no findings with respect to plaintiff's mental health condition prior to his date last insured.[3]  Thus, the late October 2000 letter written by Dr. Sands does not establish that plaintiff had a "severe" mental impairment prior to or as of his date last insured.

Plaintiff points to the testimony of Dr. John Kooiker, one of the two medical experts who testified at the administrative hearing, to support his argument that his alleged mental impairments were disabling prior to his date last insured.  At the hearing, Dr. Kooiker testified that prior to June 28, 1998, plaintiff had moderate restrictions in his activities of daily living, and marked difficulties in social functioning and in maintaining concentration, persistence and pace. Tr. 584.  Dr. Kooiker admitted, however, that this mental functional assessment was based on plaintiff's testimony, rather than on any psychiatric or psychological

---

[3]Although it is possible for a claimant to establish "continuous disabling severity by means of a retrospective diagnosis," as just discussed, such is not the case here. Flaten, 44 F.3d at 1461 (claimant is eligible for coverage only if current period of disability extends back continuously to onset date prior to date last insured).

1  evaluations contained in the record. Id.

2        With respect to Dr. Kooiker's opinion, the ALJ found as follows:

3        Dr. Kooiker's testimony is carefully considered, but it is again noted that the only
         treating records of relevance are from Dr. Sand, and his first appointment was in August
4        2000.  That was long after the claimant's insured status expired in June, 1998.  The only
         psychological evaluation in the file for the period prior to the date the clamant [sic] was
5        last insured does not show any significant mental impairment (exhibit 6F).  Dr.
         Kooiker's testimony has no objective basis in the relevant record.  His opinion is
6        therefore rejected.

7  Tr. 25.  Although the ALJ failed to note here the report of Dr. Burkhart, his findings are supported by the

8  substantial evidence in the record.  As noted above, Dr. Kooiker admitted his assessment was based on

9  plaintiff's testimony, rather than on the medical evidence in the record.  That evidence, as discussed above,

10 shows that plaintiff had no severe mental impairment prior to his date last insured.  Further, as discussed

11 below, the ALJ did not err in discounting plaintiff's credibility.  Thus, the ALJ also did not err in finding Dr.

12 Kooiker's opinion was not supported by the objective medical evidence in the record.

13       Plaintiff asserts that objective findings are not required to prove the presence of an impairment.  He

14 cites to Shore v. Callahan, 977 F.Supp. 1075, 1099 (D. Or. 1997), as support for this assertion.  The court

15 in that case, however, merely held that no objective medical "testing" was required in order to corroborate

16 the claimant's symptoms. Id. (citing Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.1975)).  Specifically,

17 in that case, the court was dealing with a diagnosis of chronic fatigue syndrome ("CFS"), which it found

18 could not be "conclusively diagnosed in a laboratory setting." Id.  To establish disability though, plaintiff

19 must establish that he is unable to "to engage in any substantial gainful activity by reason of any medically

20 determinable physical or mental impairment which can be expected to result in death or which has lasted or

21 can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

22 Tackett, 180 F.3d at 1098 (emphasis added).  Thus, while laboratory "testing" may not actually be required

23 in every case, objective medical "evidence" of at least some sort is needed.

24 IV.    The ALJ Properly Found that None of Plaintiff's Impairments Met or Equaled Any of Those Listed
        in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04
25
26       At step three of the evaluation process, the ALJ must evaluate the claimant's impairments to see if

27 they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the

   "Listings"). 20 C.F.R § 404.1520(d); Tackett, 180 F.3d at 1098.  If any of the claimant's impairments meet
28
   or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to

1    establish he or she meets or equals any of the impairments in the Listings. <u>Tacket</u>, 180 F.3d at 1098.

2        A mental or physical impairment "must result from anatomical, physiological, or psychological

3    abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

4    C.F.R. § 404.1508.  It must be established by medical evidence "consisting of signs, symptoms, and

5    laboratory findings." <u>Id.</u>  An impairment meets a listed impairment "only when it manifests the specific

6    findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

7    An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs,

8    and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

9    impairment." <u>Id.</u> at *2.  However, "symptoms alone" will not justify a finding of equivalence. <u>Id.</u>

10        Plaintiff argues that he met the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04

11    ("Listing 12.04"), based on the hearing testimony of Dr. Kooiker.  As discussed above, however, the ALJ

12    properly rejected Dr. Kooiker's testimony because it was unsupported by the medical evidence in the

13    record.  Plaintiff argues that Dr. Kooiker's testimony regarding whether he met or equaled Listing 12.04

14    was uncontradicted, as no other medical source in the record has offered any opinion on this issue.  Just

15    because Dr. Kooiker was the only medical source in the record to address specifically that issue, does not in

16    itself mean Dr. Kooiker's testimony was uncontradicted.  Indeed, the very fact that Dr. Burkhart, and, for

17    the most part, Dr. Sands, found little, if any, evidence of mental functional limitations that would prevent

18    plaintiff from working, shows that the testimony of Dr. Kooiker is not uncontradicted.

19    V.    The ALJ Did Not Err in Assessing Plaintiff's Credibility

20        Questions of credibility are solely within the control of the ALJ.  <u>Sample v. Schweiker</u>, 694 F.2d

21    639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  <u>Allen</u>, 749

22    F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

23    based on contradictory or ambiguous evidence.  <u>Id.</u> at 579.  That some of the reasons for discrediting a

24    claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

25    as that determination is supported by substantial evidence.  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th

26    Cir. 2001).

27        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

28    disbelief." <u>Lester</u>, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Plaintiff argues the ALJ did not provide any specific and legitimate, let alone clear and convincing, reasons for discounting his credibility. The undersigned disagrees. First, the ALJ discounted plaintiff's credibility in part due to the inconsistency between plaintiff's statements regarding his symptoms and the medical evidence in the record. Tr. 21-25. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). Specifically, the ALJ noted that the record indicated plaintiff had "some limitations in functioning prior to his date last insured, but not to the point of disability." Tr. 25. That finding is supported by the substantial evidence in the record.

As discussed above, the medical evidence in the record failed to show plaintiff even had a "severe" mental impairment prior to his date last insured. In addition, although the record does indicate that he had problems with his back before his insured status expired that prevented him from returning to his prior job as a truck driver, the weight of the medical evidence reveals that none of those problems rose to the level of disability, i.e., would prohibit him from performing any work. Tr. 188-89, 192, 196-202, 205-06, 215-16, 221-22, 225, 228-44, 245-64, 267, 275-76, 279, 288, 434-35, 442, 444, 446-47, 449-50, 453-54, 456-58, 476-88. Indeed, just ten days after his insured status had expired, plaintiff reported that he did not believe he was "ready for any long-term disability," and that with the level of pain he was experiencing he felt he could "participate in gainful employment in a sedentary job environment." Tr. 267.

Medical evidence in the record dated subsequent to plaintiff's date last insured also shows that for

the most part none of his impairments were disabling.  Again, as discussed above, the medical evidence in the record regarding plaintiff's mental impairments fail to show that he had a "severe" mental impairment dating back to before or as of his date last insured.  In addition, while the record shows plaintiff continued to experience back problems, those problems did not prevent him from being able to perform any work. See Tr. 266-67, 297-99, 302-17, 325, 331-36, 370, 373, 376, 462-63, 480-83, 486-87, 498.  For example, in late February 1999, plaintiff was thought to be able to perform at basically a light level of work, and in late July 1999, he was found capable of functioning "at a light to medium duty level." Tr. 299, 462.  In early January 2000, furthermore, plaintiff reported that he worked driving a truck from 3:00 a.m. until 5:30 p.m. (Tr. 334), a fifteen-hour workday, and in late June 2000, he reported that his work hours were 2:30 a.m. to 5:30 p.m. (Tr. 332).  Dr. Kenneth Sawyer, the other medical expert, also testified that prior to June 28, 1998, plaintiff could do a modified range of light work. Tr. 582-83.

ALthough Dr. John W. Robinson opined in early November 2000, that plaintiff would miss more than four days of work per week due to his condition (Tr. 379-80), there is little support in Dr. Robinson's treatment notes for that conclusion (Tr. 325, 331-36, 479-83, 486-87, 498), and, in any event, his opinion post-dates plaintiff's date last insured by nearly a year and a half.  Indeed, the following month, Dr. Robinson recommended that plaintiff "consider other vocational options beyond" truck driving. Tr. 486. While the record also contains two letters from Thomas R. Cooke, D.O., essentially stating that plaintiff was incapable of working based on his understanding of plaintiff's medical history (Tr. 493-95), no treatment or other diagnostic notes accompany those letters, and, as discussed above, the weight of the medical evidence in the record actually supports the ALJ's findings on this issue.

The ALJ also discounted plaintiff's credibility in part due to his work record. Smolen, 80 F.3d at 1284.  Specifically, the ALJ found as follows:

> The claimant testified that he had worked after the relevant time period, off and on as a fill-in logging truck driver for 6-7 months.  He did not have any particular accommodations to perform that job.  He indicated that he had returned to work truck driving in November 1999, for about four weeks, working from 2:30-3:00 a.m. to 5:00 p.m. (Exhibit 22F:5).  His driving overall seems to have taken up close to 18 months, and as stated above, this was substantial gainful work activity.  His ability to return to that job again suggests that he has not been as limited as he alleged.

Tr. 25.  Plaintiff argues the ALJ erred in so finding, again asserting that his truck driving did not amount to substantial gainful activity.  The undersigned already has upheld the ALJ on that issue.  In addition, while

1    the exact amount of time plaintiff spent driving a truck remains in dispute, and it does appear that he did

2    receive a number of accommodations, his ability to do that job even at a lighter level and to do it for up to

3    fifteen hours a day for a period of time, is indicative of a less than disabling condition.  As such, the ALJ did

4    not err in discounting plaintiff's credibility for this reason as well.

5          Lastly, the ALJ discounted plaintiff's credibility due to his activities of daily living, which included

6    mowing the lawn, watering plants, cleaning, shopping, and performing other household chores. Tr. 25.  To

7    determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily

8    activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a

9    substantial part of his or her day performing household chores or other activities that are transferable to a

10   work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability

11   benefits, and "many home activities may not be easily transferable to a work environment." Id.

12         Plaintiff argues the ALJ failed to show that such activities consumed a substantial part of his day or

13   were easily transferable to a work setting.  The evidence in the record concerning this issue is somewhat

14   mixed.  Plaintiff testified to and has reported engaging in a fairly limited range of activities of daily living.

15   Tr. 158-60, 164, 524-27, 564-65, 568.  In late February 1997, however, plaintiff told Dr. Burkhart that he

16   had "remained fairly active, despite pain," and described himself "as doing just about everything he did

17   before his back pain." Tr. 211.  In late June 1997, he again was noted to be "fairly active." Tr. 225.  Even

18   so, the ALJ seemed to acknowledge that plaintiff's activities of daily living were performed only in "short

19   intervals." Tr. 25.  Nevertheless, the fact that one of the ALJ's reasons for discounting his credibility may be

20   improper, does not render the ALJ's credibility determination invalid, as long as it is supported by

21   substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.

22   VI.    The ALJ Properly Evaluated the Testimony of Plaintiff's Mother

23         Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

24   account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

25   each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

26   testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

27   1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

28   lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ failed to provide germane reasons for rejecting the testimony of his wife. With respect to that testimony, the ALJ found as follows:

> At the hearing, the claimant's wife also testified. She stated that during the relevant time period he could not stand very long, or twist, bend and reach. He needed to sit in a reclining position, and did very little during the day, he was frustrated and had a short temper. This report is taken into account to the extent that it is consistent with the relevant medical reports. However, it is vague and very general, without the specificity needed to distinguish the claimant's functional capacity during the period at issue, nor the length of time any impairment, symptom or complex of symptoms lasted.

Tr. 25. Plaintiff first asserts the ALJ failed to give any specificity as to how her testimony was inconsistent with the medical evidence in the record. The ALJ, however, is only required to give "germane" reasons for rejecting lay witness testimony, and thus need not cite to the specific record. Lewis, 236 F.3d at 512. In addition, the ALJ did provide a lengthy analysis as to why plaintiff's symptom complaints and testimony were not consistent with the medical evidence in the record. Tr. 21-25. As the testimony of plaintiff's wife generally comported with his own testimony, the ALJ did not err here.

Plaintiff argues, however, that his wife's testimony was not vague and general, and that it did relate to the relevant time period. The undersigned agrees. While plaintiff's wife used both the present and past tense when she testified regarding plaintiff's symptoms, it does appear that she testified as to his condition prior to his date last insured at least to some extent. See Tr. 573-78. In addition, although plaintiff's wife may not have testified with the kind of specificity or as to the type of subject matter that the ALJ would have preferred, the ALJ could have questioned her further in that regard. Nevertheless, because the ALJ properly found her testimony to be inconsistent with the medical evidence in the record, the undersigned finds that the ALJ did not err in rejecting that testimony.

VII.   The ALJ Did Not Err in Finding Plaintiff Had the Residual Functional Capacity to Perform Other Work Existing in Significant Numbers in the National Economy

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

1    his or her past relevant work, and at step five to determine whether he or she can do other work. Id.

2    Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

3         A claimant's residual functional capacity is the maximum amount of work the claimant is able to

4    perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

5    must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

6    limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

7    claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

8    related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

9    medical or other evidence." Id. at *7.

10        Here, the ALJ found plaintiff had the following residual functional capacity prior to his date last

11   insured:

12        [T]he claimant retained the residual functional capacity to perform light work.  Light
          work requires maximum lifting of twenty pounds and frequent lifting of ten pounds, and
13        includes the capacity for sedentary work (20 C.F.R. §404.1567).  The claimant could sit
          and stand/walk a total of 6 hours each in an 8-hour workday, in 30-minute increments.
14        He could occasionally crouch and stoop, but he could not crawl or climb ropes, ladders,
          and scaffolds.  He was restricted from exposure to heights or hazards.
15

16   Tr. 26.  Plaintiff has not presented any specific challenge to the above residual functional capacity, aside

17   from the assertion that he should be found disabled based on the marked limitations Dr. Kooiker found he

18   had with respect to concentration, persistence and pace.  However, because, as discussed above, the ALJ

19   did not err in rejecting Dr. Kooiker's testimony, the undersigned finds the ALJ also did not err in assessing

20   the above residual functional capacity.

21        If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

22   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

23   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-(e),

24   416.920(d)-(e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

25   Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

26   v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

27        An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

28   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

     1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (because ALJ included all limitations that he found to exist, and those findings were supported by substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

The ALJ posed a hypothetical question to the vocational expert containing the same limitations as in his assessment of plaintiff's residual functional capacity. Tr. 589.  In response to that question, the vocational expert testified that an individual with that residual functional capacity could perform the jobs of delivery driver/messenger, general clerk/officer helper, and addresser. Id.  Based on the testimony of the vocational expert, the ALJ found that these jobs existed in significant numbers in the national economy, and that therefore plaintiff was not disabled at step five of the disability evaluation process. Tr. 27.

The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the Dictionary of Occupational Titles ("DICOT"). Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.  Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any discrepancy" with the DICOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1.

Plaintiff argues that the description of the above jobs provided in the DICOT, does not allow for the option to sit, stand or walk in thirty-minute increments.  It is true that none of those descriptions actually discuss a sit/stand/walk option. See Plaintiff's Opening Brief, Exhibits A, B and C.  On the other hand, such an option also is not expressly excluded.  Indeed, each of these jobs appear to be well suited for an individual who requires that type of accommodation. See id.  Even the addresser job, which is described as being sedentary, would not necessarily prohibit the ability to sit or stand/walk in thirty minute increments, particularly as plaintiff was found to retain the ability to perform at the light exertional level. See Plaintiff's Opening Brief, Exhibit C.  As such, the undersigned finds no conflict between the vocational expert's testimony and the DICOT's job descriptions.  Accordingly, the ALJ did not err in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

1

CONCLUSION

2       Based on the foregoing discussion, the court finds the ALJ properly determined plaintiff was not

3 disabled.  Accordingly, the ALJ's decision is affirmed.

4       DATED this 17th day of November, 2005.

5

6

7

8                        Karen L. Strombom

9                        United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 18